Good morning, may it please the Court, Barbara Valliere on behalf of the United States. I'd like to reserve two minutes for rebuttal, if I may. The District Court's order suppressing the firearms retrieved from Mr. Lundin's backyard in this case should be reversed for two independent reasons. The first is that there is no Fourth Amendment violation. The second is that if there was a Fourth Amendment violation, the District Court erred in its application of the inevitable discovery rule. I'm going to turn to the Fourth Amendment violation first. This is essentially a two-part argument. The first part is that the office's approach to the door to attempt to contact Lundin was reasonable and was not an unconstitutional search. And the second part of the argument is that it's Now, they did it without a warrant. That is correct, Your Honor. They did it at 4 in the morning. That is correct, Your Honor. Was there any particular reason why it had to be 4 in the morning? Well, Your Honor, I think that the record shows that the officers had received the be on the lookout alert with regard to Mr. Lundin at approximately 2 a.m. The crime itself had been committed just prior to midnight. So this was a nighttime crime. I think that this was a drive over to his house to see whether or not he was at his house at the time. And the officers then noted that the car was there and the lights were on. And so the district court, however, I think the critical errors that the district court made were twofold. The first was its application of the Supreme Court's decision in Jardine where it concluded that the purpose of the officer's purpose in approaching the house somehow invalidated their right to do what Jardine actually said officers are permitted to do, which is to essentially simply walk from onto the property, approach the front door and knock. That's exactly what the officers did in this case. Is there something in Jardine that says, as any other person would be expected or allowed to do? Correct, Your Honor. So how many people in that community are expected or allowed to knock loudly on the door at 4 in the morning? That's a good question, Your Honor. I think that the hardest part for us is the 4 a.m. piece and that in Jardine the court said generally, it said generally there is no implied license to knock on the door in the middle of the night. Nonetheless, the word generally matters because you evaluate, for constitutional purposes, you evaluate the conduct of the police officers on a reasonableness basis based on the totality of the circumstances. And if the house were burning down, it would be perfectly appropriate to come and knock on the door and say, hey, you better get out of here. Or there might be some other particular reason why 4 in the morning, but I can see no other reason than 4 in the morning than they really want to put him under some pressure and maybe want to arrest him. If they just want to talk to him, they could wait until 8 in the morning when maybe he's up. I'm not sure, Your Honor. The record shows that they were trying to locate Lundin. So in other words, they were trying to knock on his door to determine whether or not he was there, and then possibly, although it's not in their declaration, to speak with him. But it was in no event was it anything — There was a chance that if he were there, they weren't going to arrest him. What were they going to do? Well, Your Honor, I think that there is nothing in the record to indicate that they were going to conduct an unlawful arrest. That's very common sense. What were they going to do if the guy opened the door? Having the information they had, they were going to say goodbye? No. I think, Your Honor, there is nothing to assume that they were going to unlawfully arrest him. My belief is that they were trying to locate him. They certainly could have asked him whether or not to inform him that they had probable cause for an arrest based upon these violent felonies that occurred early in the day, and asked whether or not he would turn himself in. There's nothing in Jardine that prohibits. They've been told to do an 836 PC arrest. That is, an arrest with or without a warrant, with or without the officer, with or without seeing the felony, with a reasonable belief that a felony might have been committed. So they were sent out to arrest him. Well, they were sent out to be on the lookout with a PC arrest possible, if it's lawful, Your Honor. There was no reason to think that they were going to. And I think, actually, if you look at the circumstances of the approach of the door, it's obvious that the officers were not going to do anything other than something that was consensual. They approached the door. They knocked. They didn't announce themselves. They didn't say, open up. We have probable cause to arrest you. They simply tried to seek a consensual encounter, which this Court in Parea Ray said is the parameters of a permissible knock and talk. Here's a separate question. Why do you care in this case? Because I gather there was a separate later search accomplished under warrant in which guns were discovered. There were, Your Honor. So why do you care about the guns here? These are the two guns that were used in the kidnapping, Your Honor. So they've been met. These were the two weapons that were recovered in the back patio that Mr. Lundeen used to kidnap Ms. Hines earlier in the evening, held the guns to her head, and would be identified with all of the offenses that are now charged. The guns that were found at the house, very helpful to us, by the way, on the inevitable discovery argument, but the guns that were found at the house are additional evidence, as well as all the indicia that he was a Mongol and all of that, to corroborate Ms. Hines' testimony. But you've got a fair amount of evidence that he used a gun against this woman based on her own testimony. Yes, Your Honor. Of course, her credibility can be undermined by the fact that there's no, if there's no weapons that are introduced at trial that indicate that, in fact, weapons were used. So it's very important evidence in this particular case. All right. So your position would be, to go back to the purpose question, that your position in your brief was that whether they had meant to arrest him or not doesn't matter. But Jardine seems to say otherwise. No. I think Jardine, and I think this is a critical point, Your Honor, is in Jardine there was a discussion of what went beyond the scope of a licensed intrusion. And in that case, what went beyond the scope of a licensed intrusion was bringing a drug detection dog on the property. What occurred there was an unlawful search prior to the time they even knocked on the door. There was no attempt to get consent from the homeowner. Here, all they did was what they were licensed to do, which is walk to the front door. If he had sworn his rights, not answered, there hadn't been crashing sounds in the backyard, then he, then the officers ---- But that's a different question. I'm asking a legal question.  Does it matter whether they had that purpose or not? No. But Jardine says that the behavior objectively reveals a purpose to conduct a search, the earlier sentence. In talking about the general notion that subjective intent doesn't matter, as we have described, whether the officer's content was objectively reasonable in this context depends on whether the officer had an implied license, which in turn depends upon the purpose for which they entered. Correct. So they do seem to be saying that for this purpose, the purpose mattered. Again, what they were doing, the purpose for which they mattered here was that they were going to the door to make a consensual approach to the defendant. There's nothing else from the surrounding circumstances you can actually infer. I understand, but I'm still not getting an answer to my legal question. Okay. All right. My understanding is that your legal position is even so, even if we knew that that was their purpose, it wouldn't matter. That's correct, Your Honor. All right. So that's what I'm trying to find out. That seems inconsistent with Jardine. I disagree. And the reason I disagree is I think that what Jardine was concerned about was the purpose there was that they were conducting an unlawful search that interfered with the homeowner's right to consent. Here, what you have is nothing interfering with the homeowner's right to consent, even if in their head they were thinking, we want to arrest him. And again, there was nothing in their record that showed they were planning on unlawfully arresting him. Nothing interfered with the homeowner's right to stand on his rights. That's not true in Jardine. In Jardine, the search already occurred. There was no contact with the homeowner at all. If I could just for one minute turn to the inevitable discovery issue, because I think we have a very strong argument on inevitable discovery and that the district court here erred in its rejection of the government's position. This, unlike a lot of cases in the Ninth Circuit that have been brought to this court, was not a case in which the officers were trying to do an end-run around the warrant requirement. They were already going to get an arrest warrant from Mr. Lundeen. They had already – Deputy Aponte put in the record that he was, in fact, going to get a search warrant for the home and, in fact, would have gotten the search warrant regardless of whether or not they would have recovered the weapons. The district – I mean, that's what's so odd about the case. It seems that they decided not to wait to get the warrant, I mean, which wouldn't have taken very long, presumably, because of some sense that they – well, I don't know why. I mean, there was some talk in the record about it, but it's – Well, I think that the record, Your Honor, shows that the officers went to the house. There was some thought that Mr. Lundeen would try to get away because there was some thought from the victims that he may try to escape and go to his Mongol buddies rather than go home. So they located him. When they located him, they went to the house. If you look at the nature of the protective sweep they did of the house, it was just they went in and out and they found the weapons in the backyard. They didn't do a full-blown search. They then got a search warrant, which is what they were intending to do, according to Deputy Aponte, all along. So this is not a case in which there was some end-run around the warrant requirement. They simply did a knock and talk, which turned into an exes and circumstances arrest and a very quick protective sweep. But those weapons would inevitably have been found at that home regardless of whether or not this alleged illegal activity had occurred. And the record very strongly shows he kept his guns at his house and that these guns, the ammunition for these guns, were actually kept in a safe. So there's nothing really to support that the guns wouldn't have been there when they executed the search the following day. Weren't there some other occupants in the house that could have hidden the guns? Actually, Your Honor, the two daughters weren't at the home. And it turns out that, in fact, nothing happened in the day, the 24 hours between the time he was arrested and they executed the search. So there was no thing in the record to indicate that someone would, in fact, have moved those guns. And the Court's conclusion that someone would have was pure speculation, which under the case law cannot be relied on. You've used your time. Thank you, Your Honor. But for planning purposes, we'll give you a minute to respond. Thank you very much, Your Honor. May it please the Court, good morning. My name is Jeff Hanson. I'm here with Steve Kennegar on behalf of the appellee, Your Honors. To pick up where Judge Berzon asked with respect to the legal test, I don't believe there can be a more serious disagreement between two parties as to what the legal test is. Jardine, I submit to you, Your Honors, is stone cold clear that when you have an arrest warrant on somebody's property, whether it is impliedly allowed by the homeowner depends objectively on what the purpose of the entry was by the police officers. All right. So let's assume that for the moment. The district judge found that their purpose was to arrest him. Did he make that finding? He did, and that's a clearly erroneous finding that the government never really addresses at all through its papers, at least not directly. And she says there's no evidence of that. So what would you say the evidence is? There is so much evidence here. First, as Judge Baez said, there was an outstanding request to arrest my client through an 836 warrant that had been requested. There was a beyond-the-lookout statement that was presented by the officer, Detective Aponte, to request officers to essentially, I submit, arrest my client. They go there at 4 a.m. in the morning, as Judge Fletcher indicated, for which there is no real reason to do. Do we really go and talk to somebody at 4 in the morning about their past membership in the Mongo's Motorcycle Club or other things that might have tangentially related to the events at issue? So it was the timing of that, Your Honor. You have an ad- We infer from the timing of that some support for the finding that they were in the argument that we just heard, they were worried that he might run and go somewhere else and go back to his Mongol buddies. If I understand Your Honor's question, that's exactly my argument, that when you go at 4 in the morning, you're going to arrest him not to engage in a consensual encounter that any of us would have asked the public at large to do, which is, again, the inquiry that the Supreme Court has asked to undertake. Because, among other things, they might have had some reason to think that he was going to disappear on them. Which would have allowed them to certainly secure the area, which, again, the Supreme Court and this Court have both said is a proper procedure when, in fact, you're going to somebody's house at a time other than when the public would normally invite you to be there. In addition, Your Honor, they never identified themselves, and the government refers to that. And it seems to me that if you're going to consensually talk to an individual, you might knock on the door and say, Mr. London, we're the police. We'd like to talk to you about events that occurred earlier this evening. And finally, Your Honor, something as I was preparing for this last night that finally dawned on me, that when they did hear Mr. Lundeen in the back of his house, what did they do? They ordered him out, and was there any kind of engaging conversation at that point, listen, Mr. Lundeen, we've pulled you out of here now, ordered you out, because we want to talk to you about something that happened earlier? Instead, they pull him out of the backyard, they throw him on the ground, they give him, again, direct evidence that their intent all the way along was to arrest him and not to engage in a consensual encounter of any kind as a discussion. I don't think this is even close in that respect, and certainly it's not error, and certainly it's not clear error. And because Judge Tiger found as a fact that their purpose in going on to the property that easy was to engage in an arrest and not to engage in a consensual encounter and have a knock and talk, then under Jardine, this entry onto the curtilage was illegal. And because it was illegal, all that flows from that, all of the searches in the backyard, the eventual arrest, would have to be suppressed. What about the inevitable discovery issue? The inevitable discovery issue is interesting in this case only because I think the government conflates the independent source doctrine with the inevitable discovery doctrine. Here, what happened is that you seized the evidence first, you grabbed the evidence first, and then you said, we would have gotten a warrant, and in fact, a day later, they did finally come in with that warrant. But Your Honor makes the point, I think, quite fairly, is there's nothing there to indicate that they didn't, couldn't have waited for that warrant to arrive. There was no exigency here that required them to immediately go in and arrest my client. You argue, therefore, you know, with some common sense, but I don't know whether there's any case law to support it, that to allow this is essentially to allow entrants around the warrant requirement to be routine, because in most many instances in which you could have gotten a warrant but didn't get a warrant, you had probable cause to get a warrant, and that's the whole problem. You didn't get it. But is there any case law to support the notion that the inevitable discovery standard doesn't apply when you could have gotten a warrant at the outset? Yes, Your Honor. This Court has ruled in a couple of different cases. Fock is one I — Young, I think, is the one that if you could have gotten a warrant — that's the most recent 2004 — 2012 case. Young is a case in which this Court involved a hotel search, and this Court said that because you could have secured the warrant and didn't, the inevitable discovery doctrine does not apply. So there is direct authority. And there's a logical reason, Judge Berzon, for that as well, if I can explain that. Here, what in essence happens is that you seize the evidence first, and you have no historical facts that indicate that the gun still would have been there. And this was Judge Bea's point a few minutes ago. There is no historical facts that indicate the gun still would have been there at the time the search warrant, which eventually was secured, was administered and the search was undertaken pursuant to the second search warrant. It is speculation that it still would have been there. And that's the problem. Under inevitable discovery, you cannot speculate that the matter still would have been there. What we need and require — and this is Supreme Court authority — what we need and require are historical facts that indicate it would have been there. So, for example, in the independent source doctrine, when you have the police who engage in an illegal search, the property is secured, none of the property is taken or otherwise disappears, and at the end, you then secure the evidence at issue through an independent source, we know historically that the property or the evidence at issue never disappeared. And so we can say in that kind of situation, we know for sure it would have been there. When, on the other hand, you execute one search illegally and then you say, well, we could have had a search a few days later and as a consequence of that, the stuff still would have been there, now you're speculating on the government's part and that's not allowed. There is a policy reason why that's bad policy as well, Your Honors. And the reason for that is, is that it destroys the incentive to get a warrant. If you have the warrant in the first instance, then you can secure the evidence. But if you illegally seize the evidence, then you have no incentive to get a warrant because if you later get one, a few days later, you can always say, well, the evidence would have been there. And the only way it wouldn't have been there, and this was the government's argument below, the only way it wouldn't have been there is if the defendant had engaged in some kind of illegal activity and taken it away. And that's not true. You can move evidence. It can be moved innocently from one place to another. People can come and pick it up. Other members of the household could have moved it, Judge Beyer or things of that nature, and none of that would have been improperly illegal. My understanding is that you're also making, aside from any of that, a principled argument, again, a legal argument that if you had probable cause to get a warrant at the time that you illegally seized it, you can't then turn around and say, well, I would have gotten a warrant anyway. That's correct. And so there are two important factors. One is the Young case, which says that. The second thing is, again, a factual finding here by the district court, Judge Tiger, who said, in fact, that they did have time to get a warrant, and they didn't. From the time they initiated the original discussion with Ms. Hines to the time they were there conducting at 4 a.m. the illegal seizure of my client, in that regard, they had time to get a warrant. So, again, that would be something which the government would have to show to you was clearly erroneous. They never argued below nor presented a bit of evidence below, I submit, that might indicate that that was not a correct holding and certainly have not argued that on appeal. So because they were unable to do, to demonstrate that, the inevitable discovery both as a matter of fact and law, as well as, I believe, as a matter of policy, would be inappropriate here. Finally, again, generally outside of the factual finding that Judge Tiger made, this Court has ruled as well that findings of whether inevitable discovery apply are, again, subject to a clearly erroneous standard. And there was a lengthy discussion of that in the Lange case. And as a consequence of that, the fact that Judge Tiger found as a matter of law and fact, in this case that the inevitable discovery would not apply, would be subject to a clearly erroneous conclusion by this Court. I believe that his findings were completely supported by the record. And again, as I said earlier, there is no suggestion whatsoever that this is erroneous, let alone clearly erroneous. So, Your Honor, as I see I'm out of time for those reasons, I respectfully ask the Court to affirm the order of the district court and uphold his suppression order. Thank you very much. Thank you. If you'd put one minute on the clock, please. I'd like to make three points. First, Your Honor, with respect to the inevitable discovery argument, the facts here are that the events occurred, they would have to get a warrant between 2 and 4 a.m. Even the Supreme Court in Sager said that it is not reasonable to consider that the judicial officer will be available between 10 p.m. and 10 a.m. Is there a finding here? I mean, that depends on the particular jurisdiction. And I gather in this jurisdiction there was a finding. Well, this was Humboldt County, Your Honor. So to the extent that there was a finding that you could have gotten a warrant between 2 and 4 a.m., I think that that is clearly erroneous. But that assumes there was some imperative on the 4 a.m. I think here that's when the alleged illegal activity occurred. And so, in fact, Judge Tigers found in his order that they could have gotten a warrant between 2 and 4 a.m. That's what he said. You're assuming that there was some imperative that it be between 2 and 4 instead of 2 and 6. Well, they got the warrant later in the day, Your Honor. So they did get, in fact, eventually get a warrant. But in terms of their initial entry here, they could have just stood there until the warrant came, no? They could have, Your Honor, although there is no requirement that they, in fact, do so, not in any of the Supreme Court cases, that they, in fact, stay and actually secure the grounds. I don't understand. You're telling us that because the Supreme Court said in some other case that maybe they couldn't have gotten a warrant, therefore, the finding here that they could have gotten a warrant is clearly erroneous? That the finding here that they could have gotten a warrant based on all of the facts in the record we believe is erroneous, Your Honor, yes. And with — if I could just make one more point in my few seconds left. With respect to Jardine, the first issue, the Supreme Court in Jardine itself recognized that officers or individuals may approach for even unwelcome purposes. So it was contemplated that essentially purpose — that not all invitations are going to be welcome. And that's essentially what the argument here is from the defendant. Okay. Thank you, Your Honor. Thank you very much. United States v. London, now submitted for discussion.
judges: Fletcher, Berzon, Bea